## BROWN *v.* FRALEY

[No. 205, September Term, 1959.]

482

*Decided May 31, 1960.*

*Motion for rehearing and for stay of mandate filed June 29, 1960, denied July 1, 1960.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*R. Edwin Brown,* with whom was *Charles W. Bell* on the brief, for appellant.

*James R. Miller,* with whom were *John E. Oxley, Lee C. Miller* and *G. Richard Park* on the brief, for appellee.

Brune, C. J., delivered the opinion of the Court.

This is an appeal from a decree[1] of the Circuit Court for Montgomery County, in Equity, which declared that a Bill of Sale made by the appellant, Richard P. Brown, to the appellee, Brake R. Fraley, was in substance a chattel mortgage, found that there was due on the mortgage the sum of $5,462.44 and appointed trustees to sell the mortgaged property to satisfy the mortgage indebtedness.

The appellee filed a motion to dismiss the appeal, based upon Rule 835 b(5) of the Marlyand Rules, under which an appeal may be dismissed because "[t]he contents of the

---

1. The decree is not included in the appendix as required by Maryland Rules. Rule 828 b 1(a).

printed record extract do not comply with section b of Rule 828 (Part of Record to be Printed—Printed Record Extract)." There are some undoubted and admitted deficiencies in the printed record, which are stated to be the product of misunderstanding, mistake or inadvertence. The Rules are established to promote the orderly and efficient administration of justice and are to be read and followed. Those here involved, we think, are not difficult to comprehend or to follow, and we do not wish to encourage such errors as have occurred here (one of which is the failure to print the decree appealed from, contra to the explicit provision of Rule 828 b 1(a)). In this particular case, however, the missing material has been supplied, and the omissions were not deliberate. Whether to dismiss the appeal or not is discretionary with this Court, and under the circumstances just stated we do not think that such a drastic corrective is necessary in this instance. We accordingly deny the motion to dismiss.

The appellee Fraley sought to foreclose a Bill of Sale as a chattel mortgage and to have certain trucks and equipment sold to satisfy the unpaid balance secured thereby. The appellant Brown filed a cross-claim alleging that Fraley had violated a covenant in the contract for the sale of a trucking business and equipment by Fraley to Brown, pursuant to which the Bill of Sale was executed to secure the deferred payments, and that by reason of this breach the contract was rescinded and Brown was released from liability thereunder. He also asked for a judgment for the amount already paid under the contract and for an injunction enjoining Fraley from aiding in any way any competitor of Brown in the trucking business in Montgomery County. He also claimed that the Bill of Sale was not a chattel mortgage and that Fraley had not released one piece of equipment for each $1,500 reduction in the principal debt as provided by their agreement. The decree appealed from dismissed the appellant's cross-bill, but the appellant's brief makes no contention that the decree should be reversed on that account, either for the Chancellor's refusal to grant an injunction or for the denial of damages sought by the cross-bill.

On May 28, 1957, Fraley contracted to sell to Brown a

trucking business which Fraley had previously carried on in Montgomery County. The contract provided for the sale of twelve pieces of equipment used in the business and the good will of the business, and granted Brown certain incidental privileges. Fraley covenanted "not to in anywise engage in the trucking business in Montgomery County, Md., for a period of five (5) years other than the business which the Seller can do with one 16 ft. stake truck, and one pick-up truck, and does further covenant and agree not to back, assist, finance, be a silent partner, or in any way aid or engage in any business in Montgomery County, Md., for said period of five (5) years which will compete with the Purchaser's trucking business." The total price for the business was $23,000, of which $5,000 was paid at the time of the signing of the contract, $5,000 was payable, and was paid, on or before June 20th, 1957, and the balance of $13,000 was payable at the rate of $450 per month beginning August 20, 1957, with interest on the $13,000 beginning on June 1, 1957. Brown agreed to "execute and deliver unto the Seller a Bill of Sale in the usual form securing the deferred purchase money on the aforegoing equipment." The parties also agreed "that any of the aforegoing equipment will be released from the lien of said Bill of Sale at the rate of a reduction in principal amount of indebtedness at the rate of Fifteen Hundred Dollars ($1,500.00) per piece of equipment to be released, whether the same be tractors, trailers or stake trucks."

On the same day that the contract was executed the Bill of Sale from Brown to Fraley in the amount of $13,000 was executed on the equipment sold to Brown.

Brown made the required payments through February 20, 1959. Early in March, 1959, Brown discovered that Fraley's nineteen-year old son was conducting a trucking operation, including the hauling of cattle and waste from distilleries, which was the principal business of Fraley at the time he sold his business to Brown. Fraley's son was living with Fraley and the operation was being conducted from Fraley's home. Brown protested to Fraley and said that if the situation was not corrected he would stop making the payments. After demand for payment was made Fraley filed a replevin action

to repossess the equipment. He then changed his mind, dismissed the action and on April 29, 1959, filed a bill to foreclose the Bill of Sale as a chattel mortgage. Brown then filed an answer and a cross-claim. After taking testimony from several witnesses the Chancellor required Fraley to have his son move out of Fraley's house or be subject to an injunction and denial of relief until the situation was corrected (although the Court said later that Fraley did not actually aid or assist his son in the business). Fraley complied with this requirement before final decision of the case. The Chancellor then found that the contract was divisible and therefore the violation of the covenant not to compete did not prevent the foreclosure of the Bill of Sale, which was found to be a chattel mortgage. The Chancellor also found that, contrary to the contention of Brown, the second $5,000 payment was not to be applied to the lien secured by the Bill of Sale, but that only the monthly payments were to be so credited. He also held that Brown was not entitled to have any pieces of equipment released for each $1,500 by which the principal indebtedness had been reduced, whether through monthly payments or through the $5,000 payment made on June 20, 1957.

In this Court the appellant Brown contends that (1) the second $5,000 payment should have been applied to reduce the amount due under the Bill of Sale; (2) the conduct of Fraley aided and assisted his son in the trucking business; (3) the breach of the covenant not to aid or assist prevents recovery under the Bill of Sale; (4) one item of equipment should have been released for each $1,500 reduction in the principal debt, and the refusal to so release the equipment also should have prevented foreclosure under the Bill of Sale.

We shall first deal with point (3). The Chancellor found that the contract of sale was divisible and therefore held that the breach of the clause prohibiting competition by Fraley would not excuse Brown from making the payments required by the contract. As Williston points out (3 Williston, *Contracts* § 872 (Rev. Ed.)), a contract for the sale of chattels at a fixed price may also contain other promises for which no price is fixed. He gives as an example (at p. 2452) "a contract for the purchase of goods [in which] there may be a

promise for an agency or an exclusive market or for freedom from competition" and says of such a contract: "Breach of such a promise will not excuse the buyer from paying the contract price for property which he has received, nor will breach of a promise to assist in the resale of the goods sold. * * * It may be urged that frequently the defendant would not have agreed to pay this price except on the assumption that the other promises in the contract were to be kept. This is true and because it is true the injured party should be allowed to refuse to go on with the bargain if it is still wholly executory and should be allowed to rescind it even though executed, if he can restore to the other party the performance which has been received. * * * But so long as the defendant has received and retains the performance for which he promised to pay a fixed sum, it is going in the teeth of the express terms of the contract to excuse him from liability. Under such circumstances he must seek redress for non-performance of other promises in a cross-action or counterclaim, and this is true even though without fault on his part, he is unable to put the other party in *statu quo* by returning the performance which he has received." Williston, *supra,* pp. 2452-55. The following cases support this statement of the law: *Tichnor Bros. v. Evans,* 92 Vt. 278, 102 A. 1031; *Mark v. Stuart-Howland Co.,* 226 Mass. 35, 115 N. E. 42; *Springfield Seed Co. v. Walt,* 94 Mo. App. 76, 67 S. W. 938. See also *Detroit Vapor Stove Co. v. J. C. Weeter Lumber Co.,* 61 Utah 503, 215 P. 995 and Annotation, *Rights and remedies of purchaser under seller's agreement to assist him in reselling the goods,* 29 A. L. R. 666. It is pointed out in the annotation that in only one case has the breach of such a covenant been allowed to be used as a defense to an action for the purchase price. The contract in the instant case shows that the covenant not to compete is subsidiary to the sale of the trucking equipment and business, and that for any breach by the seller the buyer could be compensated by damages. This view is supported by the fact that the non-competing clause is so drawn that even minor indirect assistance to a competitor would constitute a breach of the covenant and also by the fact that the covenant runs beyond the time when the full purchase price should have been paid by Brown.

The appellant Brown sought both damages and an injunction in the trial court. Apparently because of lack of proof of the amount of damages, Brown abandoned any claim therefor during the trial. Brown's brief has not challenged the Chancellor's dismissal of the cross-bill for an injunction and, therefore, there is nothing properly before us for review on the denial thereof. *Comptroller of the Treasury v. Aerial Products,* 210 Md. 627, 124 A. 2d 805. On this appeal Brown's brief urges Fraley's breaches of the contract simply as grounds for denying Fraley relief in equity. The present suit, as the Chancellor's opinion states, would, of course, not bar a future bill for an injunction if facts not already adjudicated should warrant such a suit.

The other two questions presented by the appellant involve the interpretation of the contract. The first is whether, under its terms, the second $5,000 payment should have been applied to reduce the lien evidenced by the Bill of Sale. The appellant relies on the rule that where one is indebted to another on two debts, one secured and one unsecured, and a payment is made without specification as to the debt to which the payment should be applied, the payment should be applied to the secured debt. Whatever applicability this rule may have in other circumstances, we think it clear from the instruments involved herein that the Chancellor properly held that the second $5,000 payment was not intended to reduce the amount of the indebtedness to be secured by the Bill of Sale. The original contract provided for $5,000 to be paid at the time of the execution of the contract, another "Five Thousand Dollars ($5,000.00) on or before the 20th day of June, 1957, and the balance of Thirteen Thousand Dollars ($13,000.00) payable at the rate of Four Hundred Fifty Dollars ($450.00) per month; the monthly payments to begin on the 20th day of August, 1957; the said amount of Thirteen Thousand Dollars ($13,000.00) to bear interest at the rate of 6% per annum counting from June 1, 1957 * * *." The contract also required Brown "to execute and deliver unto the Seller a Bill of Sale in the usual form securing the deferred purchase money on the aforegoing equipment." It is to be noted that according to this clause, the Bill of Sale is to

secure "the deferred purchase money." On the same day when the agreement was executed, the Bill of Sale was also executed for the sum of $13,000. It seems clear that as of the date of the contract the "deferred purchase money" was regarded as being $13,000. There was, however, at this date $18,000 owed by Brown to Fraley.

Brown argues that the first $13,000 paid by him against the $18,000 balance should be applied against the indebtedness of $13,000 secured by the Bill of Sale because the secured debt is the more onerous. He claims that no other application is required by the contract and, hence, that the debtor is entitled to have that payment applied to the more onerous debt. This means, of course, that the last $5,000 would be unsecured. We think, however, that the reverse is true and that the contract does not permit the application of the $5,000 payment of June 20, 1957, to the secured debt. It would be most unusual for a creditor to secure by a chattel mortgage $5,000 to be paid within a month of the date of the mortgage, and yet leave unsecured a like amount to be paid in monthly installments maturing more than two years later. In addition, the contract refers to the $13,000 to be paid in monthly installments as "the balance." Thus, in one part of the contract the $13,000 is referred to as "the balance;" and in another place the "deferred purchase money." It seems quite impossible that the "deferred purchase money" was intended to include money that was to be paid in a lump sum prior to the payments on "the balance." Further showing that the contract meant that the "balance" of $13,000 was to be the $13,000 to be secured by the Bill of Sale, is the fact that the contract provides for interest to run from June 1, 1957, on the $13,000 balance, but not on the $5,000 to be paid on or prior to June 20, 1957. We think that the above, along with the fact that the amounts of the "balance" and the "deferred purchase money" are exactly the same, can only mean that the $5,000 payment was not meant to be part of the "deferred purchase money" and therefore should not be applied to reduce the lien shown by the Bill of Sale. We conclude that the Chancellor was correct in so finding.

The last point raised by the appellant is based upon the

release provisions of the contract which have been quoted above. Brown contends that he is entitled to releases of equipment both on account of the monthly payments (when in sufficient aggregate principal amounts) and on account of the $5,000 payment which fell due and was paid on June 20, 1957. The Chancellor rejected both branches of the claim—that based on the monthly payments because it was not made earlier and that based on the $5,000 both for that reason and because the Chancellor found it to be without merit.

With regard to the $5,000 payment made on June 20, 1957, as Brown claims that, after the making of the down payment of $5,000 at or before the execution of the contract on May 28, 1957, "the unpaid principal amount of indebtedness" was $18,000, there were 12 pieces of equipment, and 12 times $1,500 is exactly $18,000 so that when the last piece of equipment would be released the indebtedness would be paid in full. On these facts Brown urges that since the payment of $5,000 made on June 20 was a payment on account of the principal indebtedness it is a payment falling within the operation of the release clause and he further urges that this was what the parties intended.

Unless there is some ambiguity, the meaning of the contract is to be ascertained from the language of the written agreement. *Slice v. Carozza,* 215 Md. 357, 137 A. 2d 687. The contract of sale and the bill of sale together constituted one agreement and should be construed together. *Ahern v. White,* 39 Md. 409; *Ray v. Eurice,* 201 Md. 115, 93 A. 2d 272. Applying these rules to the agreement before us, we are unable to accept Brown's argument. The bill of sale stated as a consideration the sum of $13,000, and that was, we think, plainly the amount secured by the bill of sale, which operated as a chattel mortgage. To accept the appellant's argument would be to hold that the payment of a part of the debt not secured by the bill of sale should operate to cause the release from the lien of the bill of sale of equipment pledged as security thereunder. This would cut down the security for the $13,000 "deferred purchase money" at the very instant when the balanced payable under the contract was reduced to that amount. We think it clear that the release clause in speak-

ing of the release of equipment "from the lien of said Bill of Sale" at the rate of one piece of equipment for each "reduction in principal amount of indebtedness" of $1,500 meant reduction in the principal amount of the indebtedness secured by the bill of sale. That, the agreement of the parties plainly shows, was $13,000. That is the amount and the indebtedness, and it is the only amount or indebtedness, upon which Brown agreed to pay interest; and it is, therefore, the only part of the purchase price as to which the difference between principal and interest is significant. Construing the contract and the bill of sale together, we think it clear that the "balance of $13,000" on which Brown agreed to pay interest, the "deferred purchase money" and the "principal amount of indebtedness", all referred to in the contract, and the so-called "consideration" recited in the bill of sale (*i.e.*, the principal amount of the indebtedness to be secured thereby) all mean one and the same thing—the deferred principal balance of the purchase price in the amount of $13,000 remaining due after the second $5,000 payment.

We may add that we find the appellant's arithmetical contention under the release clause quite irreconcilable with his contention, earnestly pressed (though rejected by us) that his payment of $5,000 in June, 1957 (as well as his monthly instalment payments of $450) should be applied to reduce the secured debt. That contention, of course, would have left the last $5,000 wholly unsecured. As to that $5,000 no matching of payments and releases could be made, since nothing would be left to release.

We are, accordingly, of the opinion that all twelve vehicles should be regarded as subject to the lien of the $13,000 security instrument after, as well as before, the total principal indebtedness was reduced to that amount. We therefore agree with the Chancellor's holding that Brown is not entitled to the release of equipment from the lien of the bill of sale on account of the $5,000 payment made on June 20, 1957.

We do not, however, agree with him as to releases for payments of principal made on account of the $13,000 principal indebtedness secured by the bill of sale. They are called for in any view of the contract. We see no basis for invoking

any doctrine of waiver, estoppel or laches because of Brown's delay in asserting his rights. Nor do we find any merit in Fraley's contention that the release clause should be operative only as to voluntary advance payments of $1,500. The contract says nothing whatever about such payments and does not even provide for prepayments.

In view of our holding above, Brown has paid on the secured debt a total of $7,537.56, and is thus entitled to have five pieces of equipment released from the lien. The decree of the Chancellor must be modified to permit foreclosure only on seven pieces of equipment, rather than on the twelve pieces, and a determination of the pieces to be released and of those to be sold will have to be made. In all other respects the Chancellor's decree will be affirmed.

> *Decree affirmed in part, reversed in part, and case remanded for entry of a decree in conformity with this opinion, each party to pay one half the costs of this appeal.*

PRESCOTT, J., dissenting in part, filed the following opinion.

I agree with all of the majority opinion except the part that holds that the $5,000 payment made on June 20, 1957, was not a payment on the "principal amount of indebtedness" as provided in the contract between the parties.

The transaction involved the sale and purchase of a small trucking business including its equipment and good will. The purchase price agreed upon was $23,000; $5,000 of which was to be paid when the contract was signed (May 28, 1957); $5,000 on or before June 20, 1957; and the balance of $13,000 at the rate of $450, per month, beginning August 20, 1957, with interest from June 1, 1957. None of these facts is in dispute.

In order to effectuate the transaction between the parties, they met on May 28, 1957, at a lawyer's office. A contract was prepared and executed that called for the purchase by Brown and the sale by Fraley of the trucking business, its equipment (which consisted of exactly twelve pieces of mo-

tor equipment) and good will. The purchase price and the mode of its payment were as above set forth. While there were, of course, other provisions in the contract, the only relevant ones concerning the specific issue here being discussed were that the purchaser agreed to execute a bill of sale in the usual form upon the equipment, securing *"the deferred purchase money,"* and, in the next sentence in the contract, it was mutually agreed that any of the "aforegoing equipment" will be released from the lien of the bill of sale "at the rate of reduction in *principal amount of indebtedness* at the rate of Fifteen Hundred Dollars ($1,500.00) per piece of equipment to be released * * *." (Italics added.) Simultaneously with the execution of the contract, Brown executed the bill of sale called for therein, which simply provided that for and in consideration of the sum of $13,000 Brown bargained and sold unto Fraley the twelve pieces of equipment. The bill of sale made no reference as to when or how the $13,000 was payable; whether or not it was to bear interest; or when and under what circumstances the equipment was to be released. Obviously, the contract and the bill of sale constituted an integrated transaction and they must be construed together, a fact upon which all seem to agree.

Thus, it is seen that on May 28, 1957, when the parties executed the contract and the bill of sale Brown owed Fraley $18,000, payable, as above stated, $5,000 on or before June 20, 1957, and the remaining $13,000 in monthly installments. The parties had agreed that the purchaser would execute a bill of sale securing "the deferred purchase money" (this necessarily was $13,000 as the bill of sale for that amount was executed at the same time); and they also agreed that the equipment would be released from the lien of the bill of sale "at the rate of reduction in principal amount of indebtedness" of $1,500 per piece of equipment. It is clear to me that the $5,000 payable (and which was paid) on June 20, 1957, was a "reduction in principal amount of indebtedness." If it did not mean this, I fail to know what it did mean. When the contract was signed on May 28, Brown owed Fraley $18,000. On June 20, when he paid Fraley $5,000, he certainly, as a pure matter of arithmetic, only owed him $13,000, which, to

me, necessarily constituted a "reduction in [the] principal amount of the indebtedness." Moreover, it will be noted that there were twelve pieces of equipment covered by the bill of sale, and twelve times $1,500 is exactly $18,000, the amount of the principal indebtedness from Brown to Fraley when the contract and bill of sale were executed; on the other hand, if the amount of the consideration named in the bill of sale, $13,000, be divided by twelve, the quotient is $1,083.33, an odd amount.

I think that when Brown paid Fraley the $5,000 on June 20, this constituted a reduction in the "principal amount of indebtedness," and Brown was entitled to a release from the bill of sale of three of the pieces of equipment.